# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EDWARD MITCHELL, | ) |
| | ) |
| Petitioner, | ) |
| | ) Case No. 12 cv 9603 |
| v. | ) |
| | ) Judge Sharon Johnson Coleman |
| Jacqueline Lashbrook[1], | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

Petitioner Edward Mitchell, a Menard Correctional Center inmate, brings a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He was convicted of first degree murder on retrial in the Circuit Court of Cook County. *Illinois v. Mitchell,* No. 1–08–3143, 2011 IL App (1st) 083143 (Ill.App.Ct. Aug. 5, 2011) (direct appeal ruling). (Dkt. 54–1 at ¶1). He is serving a one-hundred year prison sentence. (*Id.*). For the reasons set forth below, the petition is denied.

I.  **Background**

The following facts are drawn from the state appellate court opinion on direct review following Mitchell's second trial. "The state court's factual determinations are entitled to a presumption of correctness, and Petitioner has the burden of overcoming this presumption by clear and convincing evidence." *Thompkins v. Pfister,* 698 F.3d 976, 983 (7th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1); *McCarthy v. Pollard,* 656 F.3d 478, 483 (7th Cir. 2011)).

On August 21, 1999, Mitchell and his codefendant Kevin Johnson were charged by indictment with first degree murder of Paulette Peake, age eight. Based on Paulette's age, the State filed notice of intent to seek an extended sentence upon conviction. Paulette was shot shortly before

---

[1] Mike Atchison is no longer the Warden at Menard Correctional Center. The Court substitutes the current Warden, Jacqueline Lashbrook, as respondent. *See* Fed. R. Civ. P. 25(d).

9:30 p.m. on July 31, 1999, while she stood in the checkout line of Pat's Food Store, a neighborhood grocery store located at the corner of 79th Street and Sangamon Avenue in Chicago. Codefendant Johnson pled guilty to conspiracy to commit murder, attempted aggravated battery, and armed violence. In exchange for his testimony at Mitchell's trial, Johnson received a sentence of 20 years, with day-for-day credit.

Mitchell was originally convicted by a jury in 2002. The Illinois Appellate Court ruled that Mitchell's videotaped confession was involuntary and remanded for a new trial. *People v. Mitchell,* 354 Ill.App.3d 396, 405, 289 Ill.Dec. 977, 820 N.E.2d 1052 (2004). The Illinois Supreme Court denied the State's petition for leave to appeal, but directed the appellate court vacate its decision and reconsider in light of *People v. Willis,* 215 Ill.2d 517, 294 Ill.Dec. 581, 831 N.E.2d 531 (2005). *People v. Mitchell,* 216 Ill.2d 717, 296 Ill.Dec. 102, 834 N.E.2d 907 (2005). Upon reconsideration, the Illinois Appellate Court again remanded for a new trial based on the same ground. *People v. Mitchell,* 366 Ill.App.3d 1044, 304 Ill.Dec. 823, 853 N.E.2d 900 (2006).

*Evidence at Second Trial*

As the State's first witness, codefendant Kevin Johnson claimed he was at home all evening until immediately prior to the shooting on July 31, 1999. Johnson testified the day before he and Mitchell were shot at near the grocery store, which Mitchell denied in his testimony. The store surveillance video showed a rival gang member by the nickname of "Toppy" near the store at the time of the shooting. Johnson considered Toppy to be an "enemy" even though Toppy, Mitchell and Johnson were members of the same gang. Johnson testified he saw Mitchell shoot the rifle in the direction of the store and Toppy.

Three neighborhood residents also testified for the State. Mary Lewis testified she saw Toppy walking toward the store just before she heard gunfire. Mary Lewis testified she saw Mitchell, the codefendant, and a third man walking back and forth near the store. According to her testimony,

2

Mary Lewis did not see the actual shooting, though a defense investigator testified that Mary Lewis told him she saw shots being fired at Toppy. Marie Coffee testified she saw codefendant Johnson running in the alley shortly after the gunfire. Demetrius Jones, a witness from the first trial, could not be located at the time of Mitchell's second trial. On the State's motion, the trial court ruled that Jones an unavailable material witness and permitted a law clerk to read Jones' testimony from the first trial to the jury.

At Mitchell's first trial in 2002, Jones testified he was 29 years old and attending Knoxville College in Knoxville, Tennessee. When not attending college, he lived with his mother and sister in Chicago on Sangamon Avenue, near the grocery store. Jones testified he was not a member of a gang, but he knew Mitchell was a member of the Vice Lords gang. Jones testified that in July 1999, he was "in the Naval Academy at Great Lakes, [Wisconsin]." In a follow-up question, he clarified he was at the naval boot camp at Great Lakes. He stated he received a pass to visit his mother and sister. At approximately 9 p.m., he went with his mother to meet a family friend at a lounge at 79th Street and Morgan Avenue, one block west of Sangamon. After leaving the lounge, he and his mother walked east toward the grocery store. As they were walking, Jones looked in the direction of the school that was diagonally across 79th Street from the grocery store, where he saw Mitchell with a younger man. He described the clothing Mitchell was wearing. Jones and his mother stepped into the grocery store to briefly greet the owner. Upon leaving the store, Jones saw Mitchell still near the school.

As Jones and his mother walked south to her house on Sangamon, Jones greeted Toppy and stopped to talk with a friend named Linda. While Jones was talking with Linda, he heard 6 to 10 gunshots coming from near the school. Jones ducked between a parked vehicle and a tree until the shooting stopped. During the shooting, he saw his mother jogging toward her house. He then looked in the direction of the school and saw Mitchell with a rifle. Jones testified he was familiar

3

from his military training with the type of rifle he observed. At the time Jones saw Mitchell with the rifle, Mitchell was wearing a black or dark blue jacket, different clothing than when he first saw him. Jones observed Mitchell placed the rifle in his jacket with the barrel pointing down, but the barrel was still visible. He next observed Mitchell run east, down an alley immediately to the south of the school. Jones then ran into the grocery store, where he saw a little girl had been injured. When he exited the store, the police were on the scene and Jones observed an officer recover a bullet casing. Jones also saw Mary Lewis in the crowd that had gathered. Jones attempted to talk to an officer about what he had seen, but the officer was too absorbed in crowd control so he went home. The following day, the police were in the area. Jones told a police investigator what he saw the previous day and provided his telephone number. He testified that on August 4, 1999, he was transported by Chicago police officers from the Great Lakes naval base to the police station at Area 2. At Area 2, Jones identified Mitchell in a lineup. During his testimony, Jones identified a rifle and jacket as similar to those in possession of Mitchell after the shooting. Jones testified he viewed the store's surveillance tape that showed him and his mother entering and exiting the store. The tape also depicted Toppy entering and exiting the store. The tape showed Jones entering the store once again after the shooting when he saw the injured girl. On cross-examination, Jones denied telling Area 2 detectives that when the gunfire started, he pushed his mother into an alley.

Illinois State Police DNA analyst Harold Johnson was qualified as an expert. Mitchell unsuccessfully sought to exclude the expert's testimony because "it was too inconclusive." Analyst Johnson testified he extracted DNA from swabs taken of a pair of gloves recovered from the same garage where the rifle was recovered. The swabs contained a mixture of human DNA profiles from at least three individuals. He testified that to positively identify the contributor of DNA, he would need to locate "13 specific segments of the DNA" or loci. He testified he was able to obtain a profile of only four loci of three different individuals from the swabs. DNA analyst Johnson opined

4

that "1 in 71 black, 1 in 71 white and 1 in 82 Hispanic unrelated individuals cannot be excluded from having contributed to this mixture of DNA profiles." Johnson concluded Mitchell "could not be excluded as a donor to that mixture." He testified his conclusion was based solely on his comparison of the 4–loci profile. On cross-examination, analyst Johnson testified a 13–loci profile is necessary to make a positive identification because "13 markers… were chosen by the FBI." He clarified that while the mixture was from at least three individuals, the mixture could have come from more than three individuals. He admitted that it was "entirely possible that twenty people wore those gloves and didn't leave DNA behind."

Chicago police detective Arteaga testified he determined that the bullet that struck Paulette was fired from 7915 S. Sangamon based on where Paulette was standing when she was hit by the bullet. The address is the first house that abuts the alley that runs east and west and separates the school from the residences. The house at 7915 had bushes in front. In the bushes, Arteaga recovered five 9–millimeter Luger cartridge cases and three 40–caliber Smith and Wesson cartridge cases. Arteaga testified he was "certain" the bullet that killed Paulette was the 9–millimeter bullet found inside the store and not the 40–caliber bullet found outside the store. Arteaga admitted, however, it was possible that the bullets could have been kicked around in the chaos following the shooting. A "Diagram of the Area of 79th & Sangamon Av.," depicting the grocery store, the school, the streets just east and west, and the addresses of houses on the block south of 79th Street, was admitted as State's exhibit 43.

On August 1, 1999, Arteaga went to a garage located at the rear of 7927 S. Sangamon. According to codefendant Johnson, the garage was where the Vice Lord street gang, the gang he and Mitchell belonged to, stored weapons and ammunition. A black HIPoint, 9–millimeter semiautomatic rifle with a metal barrel was recovered from the rear seat of a stripped-down car in the garage. The parties stipulated that the 9–millimeter bullet recovered at the grocery store and the

5

five cartridge cases found in the bushes near the school were fired from the recovered rifle. Arteaga also found a blue windbreaker, black leather gloves, and a hat in the garage, along with numerous boxes of ammunition and a pane of glass.

Michael Kopina, an expert in gunshot residue analysis, testified he tested the leather gloves and windbreaker recovered from the garage. To a reasonable degree of scientific certainty, Kopina found gunshot residue on both the gloves and left and right cuffs of the jacket.

The circuit court accepted Heather Adams Siemer as an expert in fingerprint examination, over Mitchell's objection. Siemer testified to her analysis of latent prints from two items recovered from the garage where the rifle and clothing were discovered. A latent print was "developed" from an ammunition box, displayed as State's exhibit 67. The latent print on the box was photographed, which the State displayed as exhibit 85. Siemer also testified regarding two "lifts" of latent prints from the pane of glass, displayed in State's exhibit 74. The photograph of the lift was displayed in State's exhibit 87. As lifts, the latent prints were capable of immediate comparison to Mitchell's known prints, displayed as State's exhibit 79. As to each latent print, Siemer examined the latent impression or lift "for certain things like pattern type, ridge flow, and things such as this… [Like] ridges that end, ridges that split into two, and short ridges or dots. I took that information from the latent [and] went along to each of the inked prints to see if I had a match." The two latent prints matched Mitchell's prints from his number three finger and number eight finger. Siemer explained to the jury her comparison process with the aid of State's exhibit 86, "a court chart of the latent print from the lift." Five comparison points were marked on the chart. Siemer testified she quickly found "13 points of comparison," but did not mark all 13 points on the chart because it would "be kind messy with all the lines and stuff like that." On cross-examination, Siemer admitted she was unfamiliar with "ACE–V," which defense counsel characterized as "the standard method of doing fingerprint comparison now that's used by the FBI." Siemer admitted she made no notes of her

6

comparison of the latent and known fingerprints. Siemer made no examination of the ammunition box for fingerprints belonging to anyone else. "Once I identified Mr. Mitchell I deferred processing." She never examined the glass pane directly.

The medical examiner testified Paulette was killed by a single gunshot that struck her chest and exited her back.

After Mitchell's motion for a directed verdict was denied, three witnesses testified in Mitchell's case-in-chief, including Mitchell. Mitchell admitted he was arrested, on the day of the shooting, around 9:30 p.m. near 80th Street and Peoria, one block east of Sangamon. Mitchell denied firing a gun near the school. He admitted he was a member of the Vice Lord street gang and hung out with other gang members on the 7900 block of South Sangamon. During cross-examination, Mitchell admitted hanging out in the "barn" more than 10 times. He recalled touching things in the barn when items were relocated there. The items in the barn might "possibly" have included ammunition boxes.

Following the State's rebuttal, the defense made an offer of proof to impeach Demetrius Jones' testimony beyond the transcript read to the jury. The defense also moved to strike the testimony of Harold Johnson, contending he was not qualified to give testimony on statistical analysis. The circuit court rejected the proposed impeachment of Jones and denied the motion to strike. The jury found Mitchell guilty of first degree murder after about 1 hour and 15 minutes of deliberation.

On direct appeal to the Illinois Appellate Court following his conviction after the second trial, Mitchell raised three main issues: (1) Mitchell challenged the fingerprint evidence introduced at trial, arguing that expert's opinion lacked foundation and that he was entitled to a *Frye* hearing to challenge examiner Siemer's methodology for comparing latent and known fingerprints, *see Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923); (2) Mitchell also challenged the admission of testimony

7

from DNA Analyst Harold Johnson over his objection; (3) Mitchell asserted that he should have been allowed to impeach the testimony of Demetrius Jones, who testified at the first trial but could not be located for the second trial, during which his testimony was read into the record. *People v. Mitchell*, 2011 IL App (1st) 083143, at ¶¶21-44 (2011). Mitchell further argued that the cumulative effect of these errors deprived him of a fair trial. *Id.* at ¶46. The appellate court affirmed the conviction and sentence.[2] The court also corrected the mittimus to reflect an additional 12 days of credit. Justice Robert E. Gordon wrote a lengthy dissent. The Illinois Supreme Court denied Mitchell's petition for leave to appeal ("PLA").

On November 27, 2012, Mitchell filed a *pro se* petition for postconviction relief pursuant to 725 ILCS 5/122-1, *et seq.*, in the Circuit Court of Cook County. He raised the following claims: (1) that he was arrested without probable cause and did not receive a probable cause hearing within 48 hours of his arrest; (2) codefendant Johnson's testimony should have been suppressed because of the delayed probable cause hearing; and; (3) trial counsel was ineffective for not arguing to suppress Jones' testimony based on the delayed probable cause hearing, and appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness on this ground. Dkt. 54-19, Ex. P at C66-83.

The Circuit Court of Cook County summarily dismissed Mitchell's postconviction petition after finding the arguments frivolous and patently without merit on February 21, 2013. *Id.* at C229; *People v. Richardson,* 189 Ill. 2d 401, 407, 727 N.E.2d 362, 367 (2000) (The court may summarily dismiss a petition when the claims are non-meritorious.). Mitchell filed a timely notice of appeal. Appellate counsel moved to withdraw and Mitchell filed an objection to that motion. The Illinois Appellate Court granted counsel's motion to withdraw and affirmed the summary dismissal of Mitchell's postconviction petition.

---

[2] Presiding Justice Rodolfo Garcia delivered the opinion of the court, joined by Justice Robert P. Cahill.

While his state postconviction petition was pending, Mitchell filed the instant federal habeas corpus petition under 28 U.S.C. § 2254, asserting the following grounds for relief:

1) admission of the fingerprint expert's testimony violated his right to due process;

2) the trial court's failure to hold a Frye hearing on the fingerprint expert's testimony violated his right to due process;

3) admission of the DNA expert's testimony violated his right to due process;

4) the evidentiary errors, taken as a whole, violated his right to due process; an

5) the state trial court erroneously excluded evidence that would have impeached testifying witness Demetrius Jones.

Mitchell was granted leave to amend his habeas petition in February 2016.[3] Dkt. 59. The following grounds for relief are raised in the amended petition:

6) the state trial court erred by not advancing Mitchell's postconviction petition to second-stage proceedings;

7) Mitchell was denied a prompt probable cause determination in violation of the Fourth Amendment;

8) trial counsel was ineffective for failing to

   (a) move to suppress evidence based on the delayed probable cause determination;

   (b) present the prior testimony of alibi witness Dennis Ward; and

   (c) object to the introduction of Demetrius Jones' testimony from petitioner's 2002 trial; and

9) appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness.

---

[3] Respondent objects to the amended petition as untimely. Respondent argues that the one-year limitations period expired on January 21, 2015, and his proposed amendment was not filed until June 11, 2015. This Court nevertheless allowed the amended petition, in the interest of justice, because this case went through periods of stay and tolling and the Court's own delay in ruling on the motion.

## II.     The AEDPA Standard

Petitioner must demonstrate that he is in custody in violation of the Constitution, laws, or treaties of the United States before a writ of habeas corpus will issue. 28 U.S.C. § 2254(a). Because the state courts adjudicated all but two (6 and 8(b)) of Mitchell's claims on the merits, the Court's review of the present habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d).

"'A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts.'" *Premo v. Moore*, 562 U.S. 115, 128 (2011) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). "An 'unreasonable application' occurs when a state court 'identifies the correct legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of Petitioner's case.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (opinion of O'Connor, J.)).

Clearly established federal law is the "'holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 412). The state court is not required to cite to, or even be aware of, the controlling Supreme Court standard, as long as the state court does not contradict the Supreme Court standard. *Early v. Packer*, 537 U.S. 3, 8 (2002). The Court begins with a presumption that state courts both know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citations omitted). This presumption is especially strong when the state court is considering well established

legal principles that have been routinely applied in criminal cases for many years. *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

The Court's analysis is "backward looking." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). The Court is limited to reviewing the record before the state court at the time that court made its decision. *Id.* The Court is also limited in considering the Supreme Court's "precedents as of 'the time the state court renders its decision.'" *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011) (quoting *Cullen*, 562 U.S. at 182; *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)) (emphasis omitted).

"The AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 134 S. Ct. 1702 (2014); *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013)). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This "'highly deferential standard [ ] demands that state-court decisions be given the benefit of the doubt.'" *Cullen*, 563 U.S. at 181 (quoting *Woodford*, 537 U.S. at 24).

**III. Petitioner's Claims**

*A. Procedural Default*

This Court first considers whether Mitchell's claims are procedurally defaulted. "There are two distinct ways in which a state prisoner can procedurally default a federal claim." *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016). The first form of procedural default arises when the state court has declined to address the claim based on independent and adequate state grounds. *Id.* (citing *Coleman v. Thompson,* 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The second form of procedural default occurs "when the federal issue was not fairly presented to the state courts and those courts would now hold the claim procedurally barred[.]" *Id.* To be fairly presented

11

to the state courts, a petitioner must present the claim through one complete round of the State's appellate process, including petition for leave to appeal ("PLA") to the Illinois Supreme Court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "The doctrine requires that petitioners fairly present their claims 'in concrete, practical terms, so that the state court is sufficiently alerted to the federal constitutional nature of the issue." *Ward v. Jenkins*, 613 F.3d 692, 696 (7th Cir. 2010) (internal quotations omitted). The Court liberally construes *pro se* petitions. *See Johnson v. Hulett,* 574 F.3d 428, 433 (7th Cir. 2009).

Respondent asserts that Mitchell's grounds for relief in 1, 2, 3, 4, and 5, are procedurally defaulted. Grounds 3, 4, and 5 were not raised in any articulation in Mitchell's PLA following his direct appeal. See Dkt. 54-8, State Court Record, Ex. E. Grounds 1 and 2 relate to due process arguments based on the admission of fingerprint expert testimony. Although Mitchell's PLA was devoted to issues relating to the admission of the fingerprinting expert's testimony, his argument was based on state law. *Id.* at 9-18. Thus, the federal constitutional now present in Mitchell's due process claim was never presented to the state court. None of these grounds for relief were raised in the postconviction proceedings either.

Mitchell could avoid procedural default of these claims by showing "either (1) 'cause for the default and actual prejudice' or (2) 'that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Thomas*, 822 F.3d at 386 (quoting *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546.). Mitchell argues in his reply that the failure to consider the claims will result in a fundamental miscarriage of justice because he is actually innocent. "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"*McQuiggin v. Perkins,* ——U.S. ——, 133 S.Ct. 1924, 1928, 185 L.Ed.2d 1019 (2013) (quoting *Schlup,* 513 U.S. at 329, 115 S.Ct. 851). The new evidence must be reliable and

12

may include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *House,* 547 U.S. at 537, 126 S.Ct. 2064 (quoting *Schlup,* 513 U.S. at 324, 115 S.Ct. 851). Mitchell raises no new evidence.

Even if this Court concluded that procedural default does not bar these claims, they fail on the merits. The admissibility of evidence is generally a matter of state law. *See, e.g., United States ex rel. Lee v. Flannigan*, 884 F.2d 945, 953 (7th Cir.1989), certiorari denied, 497 U.S. 1027, 110 S.Ct. 3277, 111 L.Ed.2d 786 (1990). Absent a showing that the admission of the evidence violated a specific constitutional guarantee, a federal court can issue a writ of habeas corpus on the basis of a state court evidentiary ruling only when that ruling violated the defendant's right to due process by denying him a fundamentally fair trial. *See, e.g., Haas v. Abrahamson*, 910 F.2d 384, 389 (7th Cir.1990). "Only when evidence is so extremely unfair that its admission violates fundamental conceptions of justice, does the Due Process Clause preclude its admission." *Perry v. New Hampshire*, 565 U.S. 228, 132 S. Ct. 716, 718, 181 L. Ed. 2d 694 (2012) (internal quotation marks omitted).

In this case, the Illinois Appellate Court held that the state's experts' testimony was admissible. The court held that the fingerprint expert laid an adequate foundation for her testimony, explained the methodology she used, and Mitchell had an opportunity to cross-examine her on all those issues. Mitchell admitted in his testimony that he may have touched the items found in the garage and that he had visited the gang-controlled garage at least ten times. As the Illinois Appellate Court noted, the fingerprint evidence was not direct evidence of his guilt. ¶ 28. In light of his own admissions and the other evidence presented at trial as well as his opportunity to cross-examine the expert, this Court finds the admission of the evidence or failure to conduct a *Frye* hearing does not violate the fundamental conception of justice. With respect to the DNA expert who testified that Mitchell could not be excluded from the profile developed from the mixture of DNA recovered from the pair of gloves, the Illinois Appellate Court found no authority to exclude DNA evidence

13

on the basis of it being too inclusive, while noting the equivocal nature of the testimony and its limited value. Dkt. 54–1 at ¶35. This Court agrees that even if the DNA evidence's probative value was limited, its prejudicial impact was also limited because the jury was free to disregard it. Neither *Frye* nor *Daubert* set a "constitutional floor on the admissibility of scientific evidence." *See Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994). Thus, this Court finds that habeas relief is not warranted on the admission of either expert's testimony because the state court did not unreasonably apply established federal law.

With regard to the claim that the trial court should have allowed Mitchell to introduce additional impeachment evidence against Demetrius Jones, this Court also finds that the state court did not unreasonably apply established federal law. Mitchell contends that he should have been allowed additional impeachment of Jones' testimony from three sources: (1) Jones' September 2, 1999, statement to the police; (2) Jones' grand jury testimony in which he clarified that Mitchell was not trying to conceal a rifle and that 15 seconds elapsed between Toppy passing him and the time that Jones heard shots; and (3) Jones' August 4, 1999, written statement in which he maintained that 10 to 15 seconds elapsed before the shots. Jones was impeached by the first statement during Mitchell's first trial; so that claim is without merit. The Appellate Court found that the other two sources did not qualify as impeaching because neither would undermine Jones' trial testimony. The Supreme Court "has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes." *Nevada v. Jackson*, 569 U.S. 505, 512, 133 S. Ct. 1990, 1994, 186 L. Ed. 2d 62 (2013) (emphasis in original). Thus, this Court finds that habeas relief is not warranted on this issue.

*B. Merits*

*Ground 6: Summary Dismissal of Mitchell's Postconviction Petition*

In ground 6, Mitchell argues that the state trial court erred by not advancing his postconviction petition to second-stage proceedings. This claim does not implicate a constitutional claim. It is axiomatic that habeas review is only available for alleged violations of the Constitution. 28 U.S.C. §2241(c)(1); *Jones v. Butler*, 778 F.3d 575, 586 (7th Cir. 2015). This Court finds that ground 6 does not raise a cognizable claim.

*Ground 7: Timeliness of Mitchell's Probable Cause Determination*

In ground 7, Mitchell asserts that he was denied a prompt probable cause determination in violation of the Fourth Amendment. "As long as a habeas petitioner enjoyed an 'opportunity for full and fair litigation of a Fourth Amendment claim' in state court, federal habeas review of the claim is barred." *Ben-Yisrayl v. Buss*, 540 F.3d 542, 552 (7th Cir. 2008) (quoting *Stone v. Powell,* 428 U.S. 465, 481–82, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)); *see also Miranda v. Leibach,* 394 F.3d 984, 990 (7th Cir.2005); *Hayes v. Battaglia,* 403 F.3d 935, 939 (7th Cir. 2005). Mitchell raised this issue on direct appeal from his first trial. *People v. Mitchell*, 366 Ill. App. 3d 1044, 1049, 853 N.E.2d 900, 906 (2006). Based in part on the delay in bringing Mitchell to court for a probable cause determination, the court found it was reversible error not to suppress his confession. *Id.* at 1055. The Illinois Appellate Court reversed the conviction and remanded the case for a new trial. The trial court suppressed the confession, which was never mentioned in his second trial. Accordingly, this claim is not subject to habeas review.

*Ground 8 and 9: Ineffective Assistance of Counsel*

In ground 8, Mitchell asserts that his trial counsel was ineffective for failing to: (a) move to suppress evidence based on the delayed probable cause determination; (b) present the prior testimony of alibi witness Dennis Ward; and (c) object to the introduction of Demetrius Jones'

15

testimony from petitioner's 2002 trial. In ground 9, Mitchell contends that his appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness. Courts apply the two-pronged *Strickland* test to evaluate ineffective counsel claims. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Mitchell must show that counsel's performance fell below an objective standard of reasonableness and that prejudice resulted. *Id.* at 687–88, 693, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. This Court's review of counsel's performance is highly deferential. *Johnson v. Loftus*, 518 F.3d 453, 457 (7th Cir. 2008). A petitioner must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674). To show prejudice, under the second prong, Mitchell "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

 *Ground 8(a): Motion to Suppress Evidence*

Mitchell argues that his trial counsel should have moved to suppress evidence that was discovered during his detention prior to his probable cause hearing. Mitchell cannot overcome the presumption that counsel acted with sound trial strategy. To prevail, ineffective assistance claims based on failure to file motions to suppress must demonstrate that the motion would have been meritorious. *Ebert v. Gaetz*, 610 F.3d 404, 415 (7th Cir. 2010). Prolonged confinement before a probable cause determination does not establish a Fourth Amendment violation or trigger the exclusionary rule under Illinois law. *See People v. Willis,* 215 Ill.2d 517, 536, 294 Ill.Dec. 581, 831 N.E.2d 531 (2005); *see also People v. Sams*, 367 Ill. App. 3d 254, 257–58, 855 N.E.2d 158, 161 (2006). Thus, Mitchell's trial counsel's failure to move to suppress certain evidence was objectively reasonable.

*Ground 8(b): Alibi Witness Testimony*

Mitchell claims that his trial counsel was ineffective for failing to introduce the prior testimony of Dennis Ward, an alibi witness who testified at Mitchell's first trial. This claim is procedurally defaulted because Mitchell failed to raise it through one complete round of Illinois appellate review. He only raised it in his appeal and PLA on postconviction. *See Lieberman v. Thomas*, 505 F.3d 665, 670-71 (7th Cir. 2007)(one complete round in postconviction proceedings requires a petitioner to have raised the issue in the trial court and appellate courts). Mitchell argues that his appellate counsel's ineffectiveness on direct appeal should excuse his procedural default on this claim. In order to successfully avoid procedural default on that basis, Mitchell would have had to raise the ineffective assistance of appellate counsel for failing to introduce the alibi testimony through one complete round of appellate review. Mitchell has not raised that issue anywhere but his habeas petition briefing. Thus, this Court finds that the claim is also procedurally defaulted. *See Dellinger v. Bowen*, 301 F3d 758, 766 (7th Cir. 2002).

*Ground 8(c): Failure to Object to the Jones Testimony*

Mitchell claims that his trial counsel was ineffective for failing to object to the introduction of Jones' 2002 testimony from the first trial. The record however demonstrates unequivocally that counsel did object to the State's motion to declare Jones unavailable and for the trial court to admit his prior testimony into evidence. Dkt. 54-4, Ex. N at 8-10. Thus, this claim is without merit.

*Ground 9: Ineffective Assistance of Appellate Counsel*

Mitchell contends that his appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness. This claim is also without merit because trial counsel was not ineffective for the reasons set forth above. Where a petitioner's claim of ineffective assistance of appellate counsel is predicated on trial counsel's alleged errors, "the two claims rise and fall together." *Johnson v. Thurmer*,

624 F.3d 786, 793 (7th Cir. 2010) (citing *Robertson v. Hanks,* 140 F.3d 707, 712 (7th Cir. 1998)).

**Conclusion**

Based on the forgoing discussion, this Court denies Mitchell's petition for writ of habeas corpus under Section 2254. [1, 45-1] This Court also declines to issue a Certificate of Appealability. Green has not made the requisite substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c).

IT IS SO ORDERED.

Date: March 31, 2018.

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge